Bruce **MESSER** and Timothy **P'Simer**,
Plaintiffs–Appellants,

v.

Fran **CURCI**, W. Gayle Foust, Kelly Newton, and Thomas Lykins,
Defendants–Appellees.

No. 85–5626.

United States Court of Appeals,
Sixth Circuit.

Argued Aug. 5, 1987.

Decided July 25, 1989.

---

Deborah G. Roher (argued), Stephen Krumm, Northeast Kentucky Legal Services Ashland, Ky., for plaintiffs-appellants.

J. Patrick Abell, Dept. of Parks, Frankfort, Ky., Paul C. Gaines, III, Frankfort, Ky., Daniel F. Egbers (argued), Cabinet for Humas Resources Frankfort, Ky., for defendants-appellees.

Before ENGEL, Chief Judge *; KEITH, MERRITT, KENNEDY, MARTIN, JONES, KRUPANSKY, WELLFORD, MILBURN, GUY, NELSON, RYAN, BOGGS, and NORRIS, Circuit Judges; and LIVELY, Senior Circuit Judge **.

BOGGS, Circuit Judge.

Plaintiffs contend that an applicant for government employment states a claim for violation of the applicant's first amendment rights by alleging that preference was given to other applicants because of their political activities. We hold that such allegation of political patronage hiring, standing alone, does not state a claim for violation of 42 U.S.C. § 1983, and thus we affirm the judgment of the district court dismissing the complaint.

I

Plaintiffs Bruce Messer and Timothy P'Simer challenged the decision of the Kentucky Department of Parks not to hire them for the 1984 season as seasonal maintenance workers at the Carter Caves State Resort Park in Carter County, Kentucky. The positions generally run for about eight months, during the warmer parts of the year. The exact number of positions available is established each year, and may vary. Plaintiff Messer had held such positions for the eight years preceding the 1984 season. Plaintiff P'Simer had held positions for the three preceding years. Plaintiffs note that they followed "the practice of annual reapplication" for these positions for the 1984 season, but discovered that they were not among those hired.[1]

Plaintiffs claim that the defendants, who are various Kentucky state or Democratic party officials, conspired to refuse to hire them because of their political beliefs and because they did not work in the successful 1983 gubernatorial campaign of Governor Martha Layne Collins.[2] Plaintiffs' legal theory was that the decisions in *Elrod v. Burns*, 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976), and *Branti v. Finkel*, 445 U.S. 507, 100 S.Ct 1287, 63 L.Ed.2d 574 (1980), which deal only with *discharges* based upon political affiliation, should be extended to cases of failure to hire based on similar grounds. The district judge, in a well-reasoned opinion, 610 F.Supp. 179, rejected plaintiffs' contention and granted defendants' motion to dismiss for failure to state a claim on which relief could be granted. Fed.R.Civ.P. 12(b)(6). A divided panel of this court reversed, reluctantly, on the authority of *Avery v. Jennings*, 786 F.2d 233 (6th Cir.), *cert. denied*, 477 U.S. 905, 106 S.Ct. 3276, 91 L.Ed.2d 566 (1986). *Messer v. Curci*, 806 F.2d 667 (1986). The panel's decision was vacated, and rehearing en banc granted, by order of January 21, 1987.

---

* The Honorable Albert J. Engel assumed the duties of Chief Judge effective April 1, 1988.

** The Honorable Pierce Lively took senior status effective January 1, 1989.

1. A third plaintiff, Thomas Damron, was employed for the 1984 season, but discharged after a month "because he was a Republican." Damron was later reemployed, but sued for damages for the period during which he was not employed. This claim was settled upon the payment of a stipulated amount as back pay, and the suit was dismissed insofar as it applied to Damron.

2. Governor Collins, a Democrat, was elected in November 1983. It does not appear in the record whether the "work" desired was in the primary election, the general election, or both. Governor Collins was nominated in a hard-fought primary against two major opponents in which she secured less than 34 percent of the vote, and won by a margin of 4,532 votes. She was victorious in the general election by 107,024 votes. R. Scammon and A. McGillivray, *America Votes 16*, at 195, 199 (1985).

II

The major sources of law on this issue are the Supreme Court's decisions in *Elrod v. Burns,* 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976), and *Branti v. Finkel,* 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980). In *Elrod,* a divided court issued three opinions, none commanding a majority, but clearly held that public employees could not be dismissed because of their political affiliation, loyalties, or beliefs, except from "policy-making" or "confidential" positions. The court rested its opinion on the belief that the first amendment rights of speech and association were violated by such specific punishment of individuals whose careers had brought them to the specific employment. 427 U.S. at 356–8, 96 S.Ct. at 2681–2; *id.* at 375, 96 S.Ct. at 2690 (Stewart, J., concurring). In *Branti,* a 6–member majority of the Court reaffirmed *Elrod* and extended it to cover discharge for political affiliation even of office-holders in professional positions, such as lawyers, so long as they were not in policy-making positions. 445 U.S. at 518–20, 100 S.Ct. at 1294–95.

Plaintiffs initially contend that this case should be treated as a discharge case under *Elrod* and *Branti.* However, this case is not similar to other cases in which a "failure to rehire" was treated as a discharge from continuing employment. In *Branti,* the Court determined that the failure to rehire the plaintiffs was a discharge even though, in form, the terms of their appointments had expired at the same time as that of their politically-appointed superior. The Court said that "the lack of a reasonable expectation of continued employment is not sufficient to justify a dismissal based solely on an employee's private political beliefs." 445 U.S. at 512 n. 6, 100 S.Ct. at 1291 n. 6. Thus, the Court simply held that what occurred in *Branti* was in fact still a dismissal. On Day 1 plaintiffs had a job, and on Day 2 they were to be terminated from that job.

In the present case, plaintiffs were not employed by the State for at least four months before the commencement of the positions for which they had applied. It is undisputed that state law provides no preference for appointment to such positions based on previous employment, and that the positions themselves simply do not exist during the off-season and are recreated by action of the Commissioner of Personnel for each succeeding year. See KRS § 18A.005(20); Dist.Ct. opinion at 4–5. Thus, under state law, Messer and P'Simer had no continuing employment status. Plaintiffs were among a number of applicants for these positions, and the failure to hire them can in no way be denominated as a dismissal under *Branti.*

Similarly, all the cases that have applied the *Branti* doctrine to failures to rehire have involved situations where a worker was informed on non-reappointment at the end of a term of employment, thus causing an actual discharge. *See, e.g., McConnell v. Adams,* 829 F.2d 1319, 1322–24 (4th Cir. 1987), *cert. denied sub nom. Virginia ex rel. State Board of Elections v. Kilgore,* — U.S. ——, 108 S.Ct. 1731, 100 L.Ed.2d 195 (1988); *Furlong v. Gudknecht,* 808 F.2d 233, 237–8 (3rd Cir.1986); *Horton v. Taylor,* 767 F.2d 471, 473 n. 1 (8th Cir. 1985); *McBee v. Jim Hogg County, Texas,* 730 F.2d 1009, 1015 (5th Cir.1984) (en banc). In the case at hand, the plaintiffs were not employed by the State at the time of the contested decision, and stood in the position of applicants for recreated seasonal positions, for which they could have failed of employment for any number of reasons, including the political patronage reasons actually involved in this case. Plaintiffs' own complaint makes this distinction in speaking of defendants' action as "denying ... Messer and P'Simer their positions," but as "terminating Damron." Thus, in this appeal, plaintiffs are in the position of any applicant who is not hired because preference has been given to others for patronage reasons.

III

The plurality opinion in *Elrod* clearly expresses a strong disapproval of the practice of patronage in all of its manifestations. *Elrod,* 427 U.S. at 353–56, 364–67, 96

S.Ct. at 2679–81, 2685–86;[3] *see also, Branti,* 445 U.S. at 518–20, 100 S.Ct. at 1294–95. However, both cases carefully limited the reach of their majority holding. In *Elrod,* the two Justices whose votes were necessary to make up the five-member majority specifically stated:

In particular, [this case] does not require us to consider the constitutional validity of a system that confines the hiring of some governmental employees to those of a particular political party, and I would intimate no views whatever on that question.

*Elrod,* 427 U.S. at 374, 96 S.Ct. at 2690 (Stewart and Blackmun, JJ., concurring).

In *Branti,* the Court stated:

In light of the limited nature of the question presented, we have no occasion to address petitioner's argument that there is a compelling governmental interest in maintaining a political sponsorship system for filling vacancies in the public defender's office.

*Branti,* 445 U.S. at 513 n. 7, 100 S.Ct. at 1292.

The Supreme Court cases do not *require* us to find constitutional fault in a system permitting patronage hiring. The options do lay out a rubric for balancing the cost of patronage in the "restraint it places on freedoms of belief and association," *Elrod,* 427 U.S. at 355, 96 S.Ct. at 2680, with the state interests in effective government; *id.* at 364, 96 S.Ct. at 2685. Thus, we turn to an analysis of the comparisons between patronage hiring and patronage dismissals, and an analysis of the *Elrod* factors in that context.

Clearly, pure patronage hiring does involve use of the resources of government to create a potential cost (and a potential benefit) to an individual exercising the right to speak and act on political issues. This has not been viewed by the Supreme Court as a *per se* unconstitutional impairment, in that the Court has reaffirmed the practice of patronage dismissals for confidential and policy-making positions. *See,*

*Branti,* 445 U.S. at 517–19, 100 S.Ct. at 1294–95. There are a number of distinctions, of considerable practical importance, between the first amendment costs of patronage firing of existing workers, and patronage hiring. First, dismissal from employment is inherently a specific punishment of specific people for activities or beliefs, past or present. Patronage hiring based on past activity or affiliation, as in the present case, simply recognizes a benefit or cost of past choices. Had the election gone differently (*see supra* n. 2), the damage to plaintiffs' employment chances might instead have turned out to be a boon.

Second, as distinct from the Communist and loyalty oath cases cited in *Elrod* (*Keyishian v. Board of Regents,* 385 U.S. 589, 87 S.Ct. 675, 17 L.Ed.2d 629 (1967); *Wieman v. Updegraff,* 344 U.S. 183, 73 S.Ct. 215, 97 L.Ed. 216 (1952)), no group is barred perpetually by law from holding any position. In many areas of the country, the political parties are reasonably competitive. In most areas, political factions are competitive. In addition, the variety of political levels, national, state, and local, can make a detriment at one level into an advantage at another. If one is very strongly disadvantaged at the local level by belonging to a party that is in the decided minority, that may be a great advantage if that party triumphs at the state or national level, as in the long-standing phenomenon (now defunct) of "post-office Republicans" in the formerly "Solid South."

Against this impairment of first amendment interests we must balance the state's interests. The prospect of employment at the behest of a successful candidate may be a significant incentive to political effort, thus contributing to the "robust and wide-open" debate frequently held up as a democratic exemplar. *See, e.g., New York Times Co. v. Sullivan,* 376 U.S. 254, 270, 84 S.Ct. 710, 721, 11 L.Ed.2d 686 (1964). Political activism has a significant cost in time, energy and emotion, and the prospect of employment on behalf of one's ideals

---

**3.** Judge Martin's dissent (pp. 227–28) cites these very passages to considerable effect. However, they are the opinion of only the three members of the Court who joined in that opinion.

can be a significant factor in overcoming those costs. The motives for such activism can be both crass and sublime. Some may be motivated by any job whose prospects may be better than in private employment. Others may be motivated by the opportunity to advance in practice the goals for which one argued in theory. Certainly this latter desire is not met only through "policymaking jobs."

In addition, when a new administration assumes office, whether it be of a different party, or a different faction from within the same party, its opportunities to implement its democratic mandate may be enhanced significantly by patronage hiring. The success of an administration and its public posture may well be decided more by the demeanor and *esprit* of the office manager, garbage collector, and road foreman than by the loyalty of the "policymaking" chief assistant to the assistant chief of some bureau. A new way of doing things, a new style of dealing with the public, a new constellation of social or political forces, may well be impossible to implement without a significant change in the personnel of public administration. Patronage hiring, even in the absence of patronage dismissal, allows such forces to come into play more rapidly than would a holding that, in effect, reads into the Constitution a particular philosophy of the Civil Service.

The above state interests significantly outweigh the possible first amendment impairment resulting from patronage hiring. This is particularly evident when we consider non-policymaking positions, for it seems anomalous that confidential and policymaking positions are exempt from the current ban on patronage dismissals (and presumably from the sought-for ban on patronage hiring), *Elrod*, 427 U.S. at 367–69, 96 S.Ct. at 2686–87, for it is exactly the people most likely to be active in political speaking who are most likely to be affected or chilled by political choices in policymaker hiring. Every man's and every woman's individual right to speak is equally precious, but more prominent speakers may contribute most to a robust public debate. Thus, there may well be more actual chilling of debate if a

Jeane Kirkpatrick may effectively foreclose appointment by her native Democrats, or a John Anderson by his native Republicans, by speaking out, than when ordinary workers reduce their state employment opportunities by failing to participate in particular political activity. Clearly, the level of impairment of speech here is less than that involved in policymaking positions, and the state's interests here are similar.

In comparing patronage preference in hiring to dismissal from existing employment, it appears that both aspects of the balance point to a significant difference. In recent cases, the Court has shown increasing concern for the rights of those already employed, and the heightened constraints on government action necessary because of that importance. *Compare Firefighters Local Union No. 1784 v. Stotts*, 467 U.S. 561, 574–79, 104 S.Ct. 2576, 2585–88, 81 L.Ed.2d 483 (1984) and *United Steelworkers v. Weber*, 443 U.S. 193, 208, 99 S.Ct. 2721, 2729, 61 L.Ed.2d 480 (1979) *with Wygant v. Jackson Bd. of Educ.*, 476 U.S. 267, 282–84, 106 S.Ct. 1842, 1851–52, 90 L.Ed.2d 260 (1986). As noted in *Wygant*, the pain to the individual from a certainty of loss of existing employment is much greater than the loss of some possibility of employment in one of a number of possible employment opportunities. On the other hand, the potential advantage to an effective and vigorous government of choosing sympathetic and enthusiastic employees is much greater than the gain from dismissal of existing employees who are, by explicit hypothesis, *Elrod*, 427 U.S. at 375, 96 S.Ct. at 2690, performing satisfactorily and are subject to dismissal for any deviations from satisfactory performance.

Under these circumstances, we cannot say that it is constitutionally impermissible for an elected official to implement a preference for political supporters in government employment where not otherwise controlled by statute. Such a practice, without more, disadvantages in only a modest way any individual not given preference and advantages in only a modest way any given individual from among those who may be given preference, with regard to a certain

number of public jobs out of all the employment opportunities available.

This result is generally in line with the results reached by other federal courts. Courts applying *Branti* have distinguished very sharply between cases in which the worker raising a claim of damage from patronage was already employed and those in which the worker was not employed. Most cases have held that an allegation of *any* detriment to an employee from exercise of free speech rights raises a constitutional claim. *Lieberman v. Reisman*, 857 F.2d 896 (2d Cir.1988); *Bennis v. Gable*, 823 F.2d 723, 731 (3rd Cir.1987); *Bart v. Telford*, 677 F.2d 622, 625 (7th Cir.1982). Some cases have restricted the full application of *Branti* to discrimination against employed workers that is the equivalent of a discharge. *Rutan v. Republican Party of Illinois*, 848 F.2d 1396 (7th Cir.1988), *aff'g* 641 F.Supp. 249 (C.D.Ill.1986), *aff'd on reh'g en banc*, 868 F.2d 943 (7th Cir. 1989), *petition for cert. filed*, 57 U.S.L.W. 3781 (U.S. May 17, 1989) (No. 88–1872); *Delong v. United States*, 621 F.2d 618, 623–24 (4th Cir.1980).

In the case of state contractors, or workers who are characterized as independent contractors rather than state employees, the circuits have consistently refused to recognize claims either for denial of new contracts, *LaFalce v. Houston*, 712 F.2d 292, 294 (7th Cir.1983); *cert. denied*, 464 U.S. 1044, 104 S.Ct. 712, 79 L.Ed.2d 175 (1984), or removal from existing contracts or contractor positions. *Horn v. Kean*, 796 F.2d 668 (3rd Cir.1986) (en banc); *Sweeney v. Bond*, 669 F.2d 542, 545–56 (8th Cir.), *cert. denied sub nom. Schenberg v. Bond*, 459 U.S. 878, 103 S.Ct. 174, 74 L.Ed.2d 143 (1982).

With regard to applicants for employment, our research agrees with the recent canvassing of the law by Judge Breyer, in which he states:

> [W]e have found no federal case holding that it violates the federal Constitution to use political criteria for *hiring*

state employees, even in circumstances where it might violate the federal [C]onstitution to *dismiss* them for political reasons.

*Estrada–Adorno v. Gonzalez*, 861 F.2d 304, 305 (1st Cir.1988) (emphasis in original). This decision goes on to discuss our Circuit's opinion in *Avery v. Jennings*, 786 F.2d 233 (6th Cir.1986), describing it as on point and standing for the proposition that the use of "political factors in hiring does *not* violate the Constitution." 861 F.2d at 305. It is true that in *Avery*, and in a scattering of other cases, there is dicta to the effect that firing and hiring should be treated the same.[4] *See, e.g., Avery*, 786 F.2d at 234; *Rosenthal v. Rizzo*, 555 F.2d 390, 392 (3rd Cir.) (dictum) *cert. denied*, 434 U.S. 892, 98 S.Ct. 268, 54 L.Ed.2d 178 (1977); *Harris v. Conradi*, 675 F.2d 1212, 1217 (11th Cir.1982) (*dictum*); *Aufiero v. Clarke*, 489 F.Supp. 650, 654 (D.Mass.1980) (*dictum*), *aff'd*, 639 F.2d 49 (1st Cir.), *cert. denied*, 452 U.S. 917, 101 S.Ct. 3052, 69 L.Ed.2d 421 (1981). However, the only courts to address the distinction directly, in *Rutan* and *LaFalce*, have come to the opposite conclusion and we believe the results in these cases are sound.

As even Judge Cudahy, partially dissenting from the broader ruling in *Rutan* allowing some unfavorable patronage personnel actions short of dismissal, has said:

> It seems to me that removing politics from the dispensation of government jobs is too daunting a task even for such all-purpose problem-solvers as the federal courts. At least the task should not be undertaken without some clearer signal from the Supreme Court..... Patronage hiring practices are of great antiquity. There may be *some* good in them in *some* circumstances but, most importantly, rooting them out is something the federal courts could not accomplish without incurring staggering and, I should think, clearly disproportionate costs. The patronage hiring practices involved here seem unvarnished and re-

---

**4.** Even if *Avery* is taken as a square holding, it is not, contrary to Judge Martin's dissent (p. 228), a precedent that "requires" us to rule for plaintiffs. *En banc* consideration is, of course, the traditional means for overruling a precedent, Sixth Circuit Court Policies, § 11.3.

dolent of another era. They could, however, be dealt with by a properly designed civil service system. This is not a job for the federal courts-*yet.*

*Rutan,* 868 F.2d at 958 (Cudahy, J., concurring and dissenting) (emphasis in original).

None of this discussion is intended to take a position on the questions of whether patronage hiring is good policy or good morals, either in this particular situation, or in any situation at all. We believe that is a question for the Executive and Legislative branches. We hold only that the arguments for the virtues or regrettable necessities of patronage, including its longstanding history and practice by many of those who participated in the creation and enactment of the Constitution and the first amendment, are sufficient to support the existence of a state interest in patronage hiring that outweighs potential first amendment infringements.

Questions of the wisdom of patronage hiring have long roiled the political history of our nation. Thomas Jefferson appointed his campaign manager, John Beckley, to the position of Librarian of Congress, a task that could hardly be considered a "policymaking" adjunct of the President. *See* R.M. Johnstone, Jr., *Jefferson and the Presidency* 105–06 (1978); M. Smelser, *The Democratic Republic 1801–1815* at 73 (1968) ("So partisan was Beckley that he contrived to make it difficult for Federalists to use the Library."). Justice Powell has pointed out the many other revered American figures who practiced patronage, while an equally distinguished list have decried it and sought its modification or elimination. *Elrod,* 427 U.S. at 378–80, 96 S.Ct. at 2691–92 (Powell, J., dissenting). This controversy was not settled at the Philadelphia Convention or by the submission to the states and ratification of the first amendment. Insofar as patronage influence on initial hiring is concerned, it is a struggle that must be fought out in the political arena, not in the courts.

The judgment of the district court dismissing this suit is AFFIRMED.

MERRITT, Circuit Judge, dissenting, with whom JONES, Circuit Judge, concurs.

In *Branti v. Finkel,* 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980), the Supreme Court, unlike our Court in the instant case, does not make the political patronage issue turn on a technical distinction between "hiring" and "firing." The distinction, as described by the Supreme Court, is a more fundamental issue of free speech: "the question is whether the hiring authority can demonstrate that party affiliation is an appropriate requirement for the effective performance of the public office involved." *Id.* at 518, 100 S.Ct. at 1295. That the Supreme Court believed that the First Amendment distinction to be drawn does not turn on technical distinctions between "hiring," "firing," "reemployment" or "reinstatement" is shown in its use of the phrase "selection or retention" in its statement that "it is difficult to formulate any [First Amendment] justification for tying *either the selection or retention* of an assistant public defender to his party affiliation." *Id.* at 520 n. 14, 100 S.Ct. at 1295 (emphasis added). I do not understand what First Amendment values inhere in the distinction between "discharge" and "failure to rehire" seasonable maintenance employees. It is a hyper-technical, formalistic distinction unrelated to free speech and association or to principles allowing the clash of political beliefs.

Our Court does not try to justify its decision by showing that "party affiliation is an appropriate requirement" for these jobs. The Court concedes that the Collins administration in Kentucky declined to continue the seasonal employment of the plaintiffs in the state parks for two simple reasons: They are not Democrats and did not support Governor Collins. Not to save money. Not to improve the parks. Not to get better workers. Not to hire more women or African–Americans. Not even because the Governor believed that Kentucky Democrats need affirmative action. No one suggests that Democrats have been dispossessed in Kentucky or that there is an imbalance in the political job market in Frankfort that needs redress. The point is

that these people are not Democrats and did not work in Governor Collins' campaign. That's politics, the Court says, American Style, in the great tradition of Jefferson and Jackson.

Like Justice Powell in dissent in *Elrod,* the Court makes an able argument supporting the American System of Political Patronage, but the Supreme Court in *Elrod* and *Branti* rejected these same arguments that our Court now makes. I have previously given my interpretation of the Supreme Court's meaning in an opinion for our Court in *Avery v. Jennings,* 786 F.2d 233 (6th Cir.1986), and I adhere to the views the panel expressed there. The principles stated in *Avery* lead to a conclusion in this case contrary to our Court's current majority view. In *Avery* we explained:

> Under the first amendment, government actions receive a much higher degree of scrutiny when those actions are aimed at restricting the content of speech than when the burden on the protected activity is an incidental consequence of other legitimate governmental concerns. *Compare Keyishian v. Board of Regents,* 385 U.S. 589, 87 S.Ct. 675, 17 L.Ed.2d 629 (1967) (invalidating statute restricting employment of communists) *with Kovacs v. Cooper,* 336 U.S. 77, 69 S.Ct. 448, 93 L.Ed. 513 (1949) (upholding limits on use of sound trucks in political campaigns) and *Prince v. Massachusetts,* 321 U.S. 158, 64 S.Ct. 438, 88 L.Ed. 645 (1944) (upholding application of child labor laws to use of children for distribution of religious literature). *See also* L. Tribe, American Constitutional Law 580–81 (1978). In the instant case the officials in question had no firm rule, regulation, or established policy foreclosing employment based on political affiliation, but their hiring system had the effect of giving weight to party affiliation.
>
> There is a significant difference between a patronage system that intentionally uses a strict political test as the standard for hiring or firing decisions, as in *Elrod, Branti, Keyishian,* [*United Public Workers v.*] *Mitchell* [330 U.S. 75, 67 S.Ct. 556, 91 L.Ed. 754 (1947)] and *Wieman, supra,* and a patronage system

that relies on family, friends and political allies for recommendations. The former has a single end tied to political belief. The latter has multiple purposes—finding good employees, maintaining and extending personal and political relationships, creating cooperation and harmony among employees. The former is designed to call attention to political differences and punish those who differ. The latter is designed to enhance the official's performance and political appeal. The former requires no weighing or balancing of factors by the elected official or the reviewing court. The latter takes into account many factors and nuances, conscious and unconscious, and its review would involve the federal courts in the complex and subjective hiring practices of elected officials at every level of government.

*Id.* at 236–37. The employment decision before us now, unlike *Avery,* is one "designed to call attention to political differences and punish those who differ." That is the distinction we should maintain. Accordingly, I would hold that the state's conduct violates the First Amendment and would grant relief to the plaintiffs.

BOYCE F. MARTIN, Jr., Circuit Judge, dissenting, with whom KEITH and JONES, Circuit Judges, and LIVELY, Senior Circuit Judge, concur.

I must respectfully dissent from the majority opinion. It is a distinction without substance to say that *Elrod v. Burns,* 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976), does not apply to the instant case because Messer and P'Simer were "not-re-hired" instead of "discharged." Plaintiff Bruce Messer was continuously hired by the Kentucky Department of Parks as a maintenance worker for eight consecutive years. Plaintiff P'Simer was hired for the same position for three consecutive years. Each year Messer and P'Simer submitted an annual application and each year the Kentucky Department of Parks continued to hire them. As the majority has pointed out so well in its discussion of the facts, these two employees were "fired" because of their failure to support a candidate for

governor who eventually was elected. Certainly this is a situation of political patronage dismissal. An administration cannot establish a system of annual reapplications in order to effectuate its system of political patronage and make an end run around the law which clearly forbids political patronage dismissals. Even if I take the majority's position that Messer and P'Simer were not "discharged," and *Elrod* or *Branti v. Finkel,* 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980), do not *require* us to hold in favor of the plaintiffs, both cases strongly suggest that a court faced with a "non-rehiring" situation should condemn the type of manipulation of human political behavior through a system of patronage that occurred in this case.

The majority reasons that due to the seasonal nature of their work neither Messer nor P'Simer were "in employment" four months before reapplying for their jobs. Therefore, the plaintiffs "had no continuing employment status," even though one had been repeatedly rehired for eight consecutive years, the other for three. The majority argues that because there was no continuity of employment, there was no "discharge" and thus each year they were new hires. The law cannot solidly stand on fortuitous factual distinctions such as the "seasonal" nature of a person's work to determine who will be subject to arbitrary political patronage dismissal. Eight consecutive years in the case of Messer and three consecutive years of employment in the case of P'Simer certainly constitutes "continuous employment" and creates some protection from arbitrary action.

The majority correctly notes that *Elrod* requires a balancing of competing interests. By directly citing to and expressly adopting the balancing test presented by the Supreme Court in *Elrod,* the majority correctly understands the significance of Messer and P'Simer's first amendment rights. As the Supreme Court stated in *Elrod:*

> Our concern with the impact of patronage on political belief and associations does not occur in the abstract, for political belief and association constitute the

*core* of those activities protected by the First Amendment.

*Elrod,* 427 U.S. at 356, 96 S.Ct. at 2681 (emphasis added). As the majority must recognize, we are not dealing with a situation in which the associational rights of Messer and P'Simer do not rise to the level of a constitutional deprivation nor with a situation where the burden on the protected activity is an incidental consequence of other legitimate governmental concerns. *See Avery v. Jennings,* 786 F.2d 233, 236 (6th Cir.1986). Otherwise, the balancing test of *Elrod* would not apply. *Id.* at 236–37. However, the majority fails to state clearly that the balancing test under *Elrod* is weighted in favor of the significant *core* first amendment rights of Messer and P'Simer. The state interests must be compelling, not merely legitimate. The majority seems to ignore this in its total absence of any indication of how significant the state interest must be when balanced against core first amendment rights. The majority asserts only that the state interests must be balanced. In the first amendment area this is an insufficient statement of the law which leads to the erroneous result in the present case.

The state interests presented by the majority are clearly not compelling. The Supreme Court in *Elrod* clearly and unequivocally rejected the majority's claimed state interests. Political patronage in employment practices is not an appropriate means to implement a democratic mandate. *See Elrod,* 427 U.S. at 367–70, 96 S.Ct. at 2686–88. The Court in *Elrod* stated that there was no justification for patronage dismissal as a means of furthering government effectiveness and efficiency; that patronage was not justified by the need for political loyalty of employees; that political patronage was not justified on the basis that it preserved the democratic process; that patronage dismissals were not the least restrictive alternative to achieving the contribution they make to the democratic process. Political patronage also does not contribute to "robust and wide-open" debate. As the Court concluded, "Patronage, therefore, to the extent it compels or restrains belief in association, is inimical to the pro-

cess which undergirds our system of government and is 'at war with the deeper traditions of democracy embodied in the First Amendment.' " *Elrod,* 427 U.S. at 357, 96 S.Ct. at 2682 (quoting *Illinois State Employees Union v. Lewis,* 473 F.2d 561, 576 (7th Cir.1972)). The majority here correctly noted that "[t]he plurality opinion in *Elrod* clearly expresses a strong disapproval of the practice of patronage in *all* of its manifestations." (emphasis added). "All" would seem to include those employees, even seasonal employees, dismissed for political patronage reasons who had been continually reemployed on a yearly basis for three to eight years.

I am also unable to see how patronage is directly related to the state interests presented by the majority. It is one thing to claim that the state interests involved are a "party's ability to implement [its] democratic mandate" and to promote " 'robust and wide-open' debate" but it is another thing to nakedly assert without reasons that patronage contributes to those state interests and to a better state government. I do not agree that political patronage logically leads to the implementation of a democratic mandate at the level of seasonal maintenance workers or that the arbitrary dismissal for political patronage purposes at the level of seasonal maintenance workers leads to "robust and wide-open" debate. Indeed, the raw exercise of political patronage here is the very antithesis of the "implementation of a democratic mandate" or "robust and wide-open" debate.

The majority states that a practice of systematic patronage is tolerable "where not otherwise controlled by statute." Such a statement ignores political reality. What incentive is there for lawmakers to fairly limit political patronage? A person who lives on bread will never outlaw butter. The majority states that a practice of political patronage of lower level employees "disadvantages in only a modest way any given individual not given preference and advantages in only a modest way any individual from among those that may be given preference...." A person's means of living, his or her job, is not to be dependent upon his or her expression of the "correct

politics" or his or her association with the "right" party. First amendment rights are not bartering tools for politicians. If, as the majority states, political patronage "advantages only in a modest way" any individual then it would seem that a constitutionally protected *core* first amendment right should outweigh that "modest advantage." As for the modest disadvantage, Messer and P'Simer lost their jobs and means of livelihood after eight and three years of continuous employment on the sole basis of their political associations and refusal to work for the "right" candidate for governor of Kentucky. In *Elrod,* the Court found that a situation in which respondents were required to work for the election of other candidates of the Democratic Party was intolerable and in violation of the first amendment, 427 U.S. at 355, 96 S.Ct. at 2680. I am unable to see this as a "modest disadvantage" and apparently, neither are the plaintiffs Messer and P'Simer.

Even if it were true that the *Elrod* and *Branti* line of cases do not *require* us to hold for Messer and P'Simer, the precedent in our own Circuit still requires us to declare that they were impermissibly denied their reemployment due to political patronage. *Avery v. Jennings,* 786 F.2d 233 (6th Cir.1986). It is irrelevant how we describe a system whose purpose "is designed to call attention to political differences and punish those who differ." *Avery,* 786 F.2d at 237. Whether we characterize the situation of Messer and P'Simer as one of "dismissal" or "non-rehiring," their termination of employment resulted from "a patronage system that intentionally uses a strict political test as a standard for hiring or firing decisions ..." with its "single end tied to political belief." *Avery,* 786 F.2d at 237. Such a result is forbidden under *Avery.* *Id.* at 237.

Finally, the majority states that the question of the use of political patronage in "initial hiring" is to be fought out in the political arena and not the courts. Questions of first amendment violations are for the courts. A person is not "initially hired" after three to eight years of faithful

service to the state. The fact that the nature of that person's work for the past three to eight years is "seasonal" also fails to make that person an initial hiree. When a person performs satisfactory work for a state in a good and faithful manner continuously for several years, it is impossible for me to see how it is in the best interest of the state or its democratic institutions to make that person's means of support contingent upon which candidate or political party "has its turn at the trough." The majority does little more than perpetuate Andrew Jackson's idea of "to the victor goes the spoils," or as one noted Kentucky politician said, "Our boys can drive those little yellow trucks just as well as theirs."

The first amendment prevents a person from being removed from employment solely for his or her political views and associations as were Messer and P'Simer in this case. In order to remain employed by the Commonwealth of Kentucky, both Messer and P'Simer were required to work for the election of the Democratic Party's candidate for governor in 1983, Martha Layne Collins. Messer and P'Simer's freedom of belief and association were severely and unjustifiably restricted in violation of the first amendment.

I, therefore, respectfully dissent.