Edward E. **RICE,** Plaintiff–Appellant, Cross–Appellee,

v.

**OHIO DEPARTMENT OF TRANSPORTATION, et al.,** Defendants–Appellees, Cross–Appellants.

Nos. 92–3855, 92–4040.

United States Court of Appeals, Sixth Circuit.

Argued Nov. 15, 1993.

Decided Jan. 27, 1994.

Andrew J. Ruzicho (argued and briefed), Columbus, OH, for plaintiff-appellant, cross-appellee.

David A. Kopech (argued and briefed), Rishel, Myers & Kopech, Columbus, OH, for defendants-appellees, cross-appellants.

Before: NELSON and BATCHELDER, Circuit Judges; and CONTIE, Senior Circuit Judge.

DAVID A. NELSON, Circuit Judge.

This is a civil rights case that has been here before on its way to and from the Supreme Court. Plaintiff Rice, an employee of the Ohio Department of Transportation, claims that his rights under the First and Fourteenth Amendments were violated when he was passed over for appointment to an administrative assistant's position. The position was filled, he says, through a political patronage system that benefited people who had closer ties than he to the Republican Party. This court affirmed a summary judgment in favor of the defendants, see *Rice v. Ohio Department of Transportation*, 887 F.2d 716 (6th Cir.1989), but the Supreme Court vacated the judgment and remanded the case for reconsideration in light of the intervening decision in *Rutan v. Republican Party of Illinois*, 497 U.S. 62, 110 S.Ct. 2729, 111 L.Ed.2d 52 (1990).

After Mr. Rice's case was returned to the district court, further summary judgment proceedings led to dismissal of the damage claims against the Department on Eleventh Amendment grounds and against the individual defendants on qualified immunity grounds. The defendants were unsuccessful, however, in an attempt to obtain summary judgment in their favor on the question whether the administrative assistant's position was a politically sensitive one that could lawfully be filled on a partisan political basis.

The plaintiff's claim for injunctive relief was subsequently tried to the court, sitting without a jury. The court denied relief on the ground that the plaintiff had not shown that his failure to land the administrative assistant's job was the result of his failure to make financial contributions to the Republican Party and his failure to participate actively in the party's work. Final judgment having been entered in favor of the defendants, the plaintiff perfected a timely appeal.

The plaintiff contends on appeal that the individual defendants waived any qualified immunity defense and that the district court abused its discretion in permitting the belated assertion of such a defense. The plaintiff further contends that the district court erred in failing to find that the reason the plaintiff was not appointed to the administrative assistant's position was that he lacked Republican Party support for the position. The defendants, who took a protective cross-appeal, contend that the district court erred in failing to find that the position was a "political" one that could properly be treated as such in the appointment process.

Although the defendants may not have demonstrated that they were entitled to summary judgment on the latter issue, the record of the trial clearly establishes, we believe, that the nature of the particular job to which the plaintiff aspired was such that the job could be filled on a patronage basis without compromising the constitutional rights of unsuccessful candidates. We shall affirm the judgment for the defendants on that ground, a disposition that obviates any need to reach the remaining issues.

I

The plaintiff, Edward E. Rice, has been an officeholder and a Republican for many years. During the 1960s he served as a deputy sheriff in Butler County, Ohio. Toward the end of the decade he was an unendorsed—and unsuccessful—Republican candidate for sheriff. As far as the record discloses, he remains a registered Republican to this day.

In 1969 Mr. Rice obtained an administrative position in the Ohio Department of Transportation. The Butler County Republican Party chairman endorsed Mr. Rice for the job, and it was this endorsement, Mr. Rice testified, that resulted in his being hired. Rice began work as an administrative specialist at a Department of Transportation office in Middletown, Ohio, on May 1, 1969. His work station was soon moved to the new headquarters of the Department's District 8 in Lebanon, Ohio.

The Ohio Department of Transportation—a labor-intensive organization with as many as 9,000 employees—was divided into 12 geographical districts. District 8 covered Butler County and seven other counties in the Southwestern part of the state. During the early 1980s the department employed approximately 750 people in District 8.

There were only two high-level jobs in the district that were not part of the classified civil service: the job of district deputy director—a position required to be filled by a registered professional engineer, see Ohio Rev.Code § 5501.14—and the job of administrative assistant. Former District Deputy Director William W. Brayshaw, who testified at trial as a witness for plaintiff Rice, described the administrative assistant's job as "the top political position in ODOT ... [at] the district level." The district deputy director and the administrative assistant both served at the pleasure of the director of transportation, and it was the director who appointed them. The director was a member of the governor's cabinet.

As a result of the 1974 gubernatorial election, in which James A. Rhodes, a Republican, was elected to succeed Democratic Governor John Gilligan, a vacancy occurred in the District 8 administrative assistant's position. Mr. Rice became a candidate for appointment to the job. The process one had to go through, he testified, entailed seeking endorsement from the Republican county chairmen for the eight counties in the district. Mr. Rice went through that process, contacting each county chairman and requesting his endorsement. A majority of the chairmen, however, endorsed a man named McKee Cornett. "[T]herefore," Mr. Rice testified, "[Mr. Cornett] was appointed to be Administrative Assistant."

Mr. Cornett subsequently offered Mr. Rice an unclassified position in the District 8 personnel office, and Rice accepted the offer. He returned to a classified position in November of 1975, and he has been a personnel officer in the classified civil service since January of 1976. In that capacity Mr. Rice sometimes functioned as administrative assistant when Mr. Cornett was on vacation or ill.

Mr. Cornett retired in December of 1981, at which time Mr. Rice contacted defendant Patrick McCray, then the department's deputy director for administrative affairs, and expressed an interest in being named as Mr. Cornett's successor. "Well," Mr. Rice quoted Mr. McCray as responding, "you know what you have to do." Mr. Rice then went around to the county chairmen and again asked for their endorsement for the administrative assistant's job.

Five of the eight county chairmen, as Mr. Rice subsequently learned from District Deputy Director Brayshaw, endorsed a rival candidate, Andrew Siehl, who was the son of the Preble County Republican chairman. The Director of Transportation, defendant David L. Weir, appointed Andrew Siehl against the advice of Brayshaw, who favored plaintiff Rice for the job.

In August of 1982 Andrew Siehl took a leave of absence to work on Congressman Clarence Brown's campaign for governor. Mr. Rice let Deputy Director McCray know of his interest in being appointed administrative assistant on a temporary basis, but James Fife, who had been a subordinate to Mr. Rice, was named acting administrative assistant instead. Mr. Fife, the son of the Clinton County Auditor, had the support of a majority of the eight county chairmen.

After the selection of Mr. Fife was announced, Mr. Rice met with Deputy Director McCray in Columbus to find out why he (Rice) had not been given the appointment. Mr. McCray told him, as Mr. Rice subsequently testified, that "[y]ou have to be endorsed by the county chairmen." In addition, Rice quoted McCray as saying, "you have to be a good contributor for the position of Administrative Assistant, and be a very active member in the Republican party."

In December of 1982 Mr. Rice brought a federal civil rights action against the Department of Transportation, Director of Transportation Weir, and Deputy Director McCray. The case was eventually dismissed on a motion for summary judgment, the district court holding, among other things, that although the First and Fourteenth Amend-

ments protect many public employees from being discharged on partisan political grounds, the Constitution does not prohibit hiring decisions from being made on such grounds. This court affirmed the dismissal, in the decision reported at 887 F.2d 716, relying on *Messer v. Curci*, 881 F.2d 219 (6th Cir.1989) (en banc).

The principle that was applied in *Messer v. Curci* did not survive *Rutan v. Republican Party of Ill.*, 497 U.S. 62, 110 S.Ct. 2729, 111 L.Ed.2d 52 (1990), where the Supreme Court held that the Constitution largely rules out reliance on party affiliation and support as a basis for hiring low-level public employees. In the wake of *Rutan* the Supreme Court vacated our *Rice* decision on a petition for certiorari,[1] and the case was remanded to us for reconsideration. We in turn vacated the judgment of the district court and remanded the case for further proceedings in that court.

After disposing of a new round of summary judgment motions, as noted above, the district court conducted a bench trial on Mr. Rice's claim for injunctive relief. Two issues were presented for decision, as the district court saw it:

"(1) whether the position of administrative assistant for District 8 of ODOT is one for which political considerations are an appropriate requirement; and

(2) if not, whether plaintiff established by a preponderance of the evidence that he was denied the promotion because he did not contribute money to or otherwise actively support the Republican party." (Memorandum and order of August 4, 1992, at p. 5.)

Some of the evidence bearing on these issues has already been alluded to, but the evidence relating to the first issue merits a somewhat closer look.

David L. Weir, who was director of transportation from January of 1977 to January of 1983, testified on cross-examination that only about 35 of the 9,000 positions of the department were outside the classified civil service. Five deputy directors at the department's central office in Columbus had unclassified

---

**1.** *Messer v. Curci* was vacated as well. 497 U.S.  1001, 110 S.Ct. 3233, 111 L.Ed.2d 745 (1990).

positions, as did the district deputy director and the administrative assistant in each of the 12 districts. Although the administrative assistant reported to the district deputy director, the latter did not have the final say on the selection of the administrative assistant; the appointment power was vested in the director of transportation personally, and the director could—and in the case of Mr. Rice did—reject advice from the district deputy director on whom to appoint.

The written job description for the administrative assistant position in District 8, as approved by District Deputy Director Brayshaw in April of 1981, identified the administrative assistant's work as covering five broad areas: "Administration, Budgeting & Auditing, Planning, Right-of-Way, and Construction." The administrative assistant coordinated policies and procedures in these areas, according to the job description; acted as liaison with central office administrators on subjects pertaining thereto; acted as liaison with the district on such matters; conferred with staff members on policy determinations and the administration thereof; supervised and directed preparation of district program reports; and provided the district deputy director with comments on the adequacy and relevance of data in the reports and on internal relationships between units of the division.

The written job description did not refer to political duties *eo nomine,* but District Deputy Director Brayshaw—the witness who characterized the job as "the top political position" in the district—testified that the job carried overtly political duties as well. The administrative assistant, Mr. Brayshaw said, was the pipeline for input from the Republican Party chairmen in the eight-county district. Recommendations on hiring matters were made by the county chairmen through the administrative assistant, according to Brayshaw. Mr. Rice confirmed that vacancies in jobs such as project inspector in the construction department and highway worker in the maintenance department were filled, provisionally, on referral to the administrative assistant by the county chairmen. (The Supreme Court's *Rutan* decision teaches that selection for low-level jobs such as

these may not constitutionally be conditioned on support by a political party; in 1982, however, when James Fife was picked to be acting administrative assistant, *Rutan* was still eight years in the future.)

Although Mr. Brayshaw said that neither he nor the administrative assistant was responsible for establishing departmental policy, each had a role in making policy recommendations in the areas for which he was responsible. The administrative assistant was expected to confer with the top staff in the district and recommend changes in policies promulgated by the central office in Columbus where changes seemed to be called for. It did not take any particular political affiliation to make such recommendations, Mr. Brayshaw acknowledged, but Director Weir explained that it was through the administrative assistant that the Department found out what the problems were at the local level. Because the administrative assistants worked with the county chairmen, local public officials, state legislators, and the general public in their respective districts, Weir testified, it was one of the functions of the administrative assistant to report public feeling on "[highway] projects, problems, whatever the Department was doing." Director Weir added that District 8 had the largest number of active highway projects within the Department.

In 1977 the Department of Transportation administered over 1,000 local government projects across the state for which federal funding was received. In addition, the Department had over 1,000 state highway projects that needed to be prioritized. The projects were reviewed to determine which ones were important to the local communities and regions, with political input and technical input coming from the district deputy directors and the administrative assistants as well as from some of the central office deputy directors. There was a period of declining revenues for some years prior to 1981, but the state gasoline tax was increased that year for the first time in decades. With increased tax revenues, as Director Weir put it, "[e]verybody wanted a piece of the money and there still was not enough money to do all of the jobs." The task of working out

appropriate priorities had a political dimension, obviously, and the record shows without contradiction that the administrative assistants provided political input in this sensitive area.

Although Director Weir testified that he regarded the administrative assistant's position as one requiring personal and political loyalty, he had executed an affidavit in 1984 in which he denied that he based his appointments to the job on political loyalty. Stressing what it viewed as a discrepancy in this regard, noting that the administrative assistant was under the direct supervision of the district deputy director rather than the director of transportation, and noting further that the administrative assistant performed most of his duties at the district level and would spend less than one percent of his time meeting with the director of transportation personally, the district court concluded that political affiliation or support had not been shown to be an appropriate requirement for effective performance of the administrative assistant's office. "Even Weir acknowledged that appointment to the position did not have to be political," the court observed. And although the court did not comment on this fact, the plaintiff points out that Weir testified he could not identify either Siehl or Fife by sight.

With respect to the second issue presented for decision, the district court found that neither Mr. Rice's failure to contribute money to the Republican Party nor his lack of active participation in Republican affairs played a substantial or motivating role in Director Weir's decision not to appoint him to the administrative assistant's position. Both Siehl and Fife may have been better situated to secure the endorsement of the Republican county chairmen, the court continued, because of the positions the candidates' fathers occupied in the Republican Party. The district court made no explicit finding as to whether endorsement by the county chairmen was a prerequisite for selection as administrative assistant. If nepotism is not unconstitutional, the court may have

considered the endorsement question irrelevant; the court may have had difficulty seeing, in other words, how a selection based on nepotism could interfere with the associational and free speech rights of the unsuccessful candidate.

The district court entered final judgment for the defendants on August 5, 1992. The plaintiff filed his notice of appeal on August 11, and the defendants filed their protective cross-appeal on September 2, 1992.

## II

Since the age of Jackson, if not before, America has been somewhat ambivalent about the political spoils system—a system which, like most human institutions, has its pluses and its minuses.[2] Serious legislative efforts to rein in the spoils system at the federal level began well over a century ago, with strong support from President Hayes. The principle that most inferior federal officers should be hired on a merit basis and should not be subject to dismissal on the basis of partisan political considerations is a principle that came to be widely accepted, if not universally approved, in the decades following passage of the Civil Service Act (22 Stat. 403) in 1883.

For the first 200 years after the Declaration of Independence, however, there would doubtless have been general agreement with the thought expressed by Chief Justice Taft in *Myers v. United States*, 272 U.S. 52, 174, 47 S.Ct. 21, 45, 71 L.Ed. 160 (1926): "The extension of the merit system," Taft wrote, "rests with Congress." Extension of the merit system at the state level, similarly, was generally thought to rest with the state legislatures.

State legislatures did not always embrace the concept of civil service reform with enthusiasm, it is fair to say, but the United States Supreme Court came to do so. The landmark case is *Elrod v. Burns*, 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976), where the question presented was whether

---

**2.** Some of the pluses are described in Justice Powell's vigorous dissents in *Elrod v. Burns*, 427 U.S. 347, 376, 96 S.Ct. 2673, 2691, 49 L.Ed.2d 547 (1976), and *Branti v. Finkel*, 445 U.S. 507, 521, 100 S.Ct. 1287, 1296, 63 L.Ed.2d 574 (1980); some of the minuses are described in Justice Brennan's plurality opinion in the former case.

non-civil-service employees of the Cook County, Illinois, sheriff's department—employees who included a process server, a court bailiff and security guard, and the chief deputy of the process division—could be discharged by a newly elected Democratic sheriff solely because they were appointees of the new sheriff's Republican predecessor and lacked the support of the Democratic party. Five members of the Court agreed that such discharges would be unconstitutional.

Justice Brennan, who announced the judgment of the Court and delivered what Justice Stewart (who concurred in the judgment)[3] called a "wide-ranging" plurality opinion, decried "[t]he inefficiency resulting from the wholesale replacement of large numbers of public employees every time political office changes hands...." *Id.* at 364, 96 S.Ct. at 2685. Given this inefficiency, Justice Brennan was not persuaded that pervasive patronage firings could be justified as promoting effective, responsive, and accountable government. While recognizing a danger that representative government might be undercut by holdover appointees obstructing the implementation of a new administration's policies, Justice Brennan wrote that this consideration was "inadequate to validate patronage wholesale." *Id.* at 367, 96 S.Ct. at 2687. "Limiting patronage dismissals to *policymaking* decisions is sufficient to achieve this governmental end," he said. *Id.* (Emphasis supplied.) Subject to a "policymaking position" exception, Justice Brennan concluded, the practice of patronage dismissals is unconstitutional under the First and Fourteenth Amendments because it encourages officeholders to compromise their true beliefs and interferes with their freedom to associate with the political party of their choice.

The scope of the exception was not clearly delineated in Justice Brennan's opinion, but several considerations were identified as relevant in determining whether a particular job would come within the exception:

> "No clear line can be drawn between policymaking and nonpolicymaking positions. While nonpolicymaking individuals usually have limited responsibility, that is

not to say that one with a number of responsibilities is necessarily in a policymaking position. The nature of the responsibilities is critical. Employee supervisors, for example, may have many responsibilities, but those responsibilities may have only limited and well-defined objectives. An employee with responsibilities that are not well-defined or are of broad scope more likely functions in a policymaking position. In determining whether an employee occupies a policymaking position, consideration should also be given to whether the employee acts as an adviser or formulates plans for the implementation of broad goals." 427 U.S. at 367–68, 96 S.Ct. at 2687.

In *Branti v. Finkel,* 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980), where Justice Stevens wrote an opinion in which all but three members of the Court joined,[4] the Court made it clear that the holding of *Elrod* was broad enough to reach "a simple requirement that an employee be sponsored by the party in power;" the *Elrod* holding was not limited to "situations in which government employees are coerced into pledging allegiance to a political party that they would not voluntarily support...." *Id.* at 512, 100 S.Ct. at 1291–92. Accordingly, the Court held in *Branti,* assistant county public defenders who had been appointed by a Republican chief public defender could not be discharged by the latter's Democratic successor solely because they did not have Democratic sponsorship.

Justice Stevens' opinion recognized, as had the opinions of Justices Brennan and Stewart in *Elrod,* that "party affiliation may be an acceptable requirement for some types of government employment." *Branti,* 445 U.S. at 517, 100 S.Ct. at 1294. Noting that Justice Stewart's opinion in *Elrod* had suggested that such a requirement would not be acceptable for "nonpolicymaking, nonconfidential," government employees, Justice Stevens observed that circumstances could exist in which "a position may be appropriately considered political even though it is neither

---

3. 427 U.S. at 374, 96 S.Ct. at 2690.

4. Justice Brennan concurred in the majority opinion; Justice Stewart dissented.

confidential nor policymaking in character." *Id.* at 518, 100 S.Ct. at 1294. On the other hand, he continued, "party affiliation is not necessarily relevant to every policymaking or confidential position." *Id.* Thus a·political test would not be appropriate for a state university football coach, even though he "formulates policy" in a sense, but such a test would be appropriate for a nonpolicymaking gubernatorial assistant hired to write speeches, deal with the press, or communicate with the legislature. *Id.*

■ The extent to which a particular job has a policymaking dimension is still relevant, we believe,[5] but the "ultimate inquiry," *Branti* teaches, "is whether the hiring authority can demonstrate that party affiliation [or sponsorship] is an appropriate requirement for the effective performance of the public office involved." *Id.* This test could not be met in the case of an assistant public defender, *Branti* continued, because "[t]he primary, if not the only, responsibility of an assistant public defender is to represent individual citizens in controversy with the State." *Id.* at 519, 100 S.Ct. at 1295. For such an official to be subject to discharge for lack of allegiance to the dominant political party, the *Branti* Court concluded, "would undermine, rather than promote, the effective performance of [his] office...." *Id.* at 519–520, 100 S.Ct. at 1295.

*Elrod* and *Branti*—both of which involve the dismissal of employees who had already been hired for the positions in question—represent the Supreme Court's last word on the extent to which political party affiliation and sponsorship are appropriate requirements for public employment. In *Rutan v. Republican Party of Illinois*, 497 U.S. 62,

110 S.Ct. 2729, 111 L.Ed.2d 52 (1990), where the Court held that promotion, transfer, recall, and hiring decisions involving certain low-level state employees could not be based on political party tests, it was conceded that none of the positions to which the plaintiffs aspired came within the exception recognized in *Elrod* and *Branti*.[6] Accordingly, the *Rutan* Court said, "[t]he scope of [the] exception does not concern us here...." *Id.* at 71, n. 5, 110 S.Ct. at 2735 n. 5.

Our court had occasion to elaborate on the scope of the *Elrod/Branti* exception in *Faughender v. City of North Olmsted, Ohio*, 927 F.2d 909 (6th Cir.1991). The *Faughender* case involved termination of the employment of a suburban mayor's secretary after the incumbent mayor, a Democrat, failed to win renomination and was replaced by a Republican. Relying in part on *Williams v. City of River Rouge*, 909 F.2d 151 (6th Cir.1990), we indicated that it was necessary to examine the duties and any political requirements of the secretary's position both in the abstract and through the eyes of the new mayor. If the duties of a mayor's secretary are inherently political, we said, a political test may be applied. Such a test could also be applied, we said, if the duties of the secretarial position *as envisioned by the new mayor* were inherently political—at least if the new mayor entertained a good faith belief that having a secretary who could perform such duties would be necessary to implement the policies of the new administration. *Faughender,* 927 F.2d at 913–14.

Analyzing the duties of the mayor's secretary both in the abstract and as envisioned by the new mayor, *Faughender* concluded that the secretary's position was inherently

---

5. In *Garretto v. Cooperman*, 510 F.Supp. 816, 819 (S.D.N.Y.1981), aff'd without published opinion, 794 F.2d 676 (2d Cir.1984), Judge Leval wrote that "[i]f *Branti* is to be read literally ... the policymaking responsibilities of the job are of no consequence." Judge Leval found it hard to believe that the Supreme Court really meant this, and we do not read Justice Stevens' opinion as saying what Judge Leval thought it said. Other courts have concluded that the presence of policymaking responsibilities continues to be relevant. See, *e.g., Ray v. City of Leeds*, 837 F.2d 1542 (11th Cir.1988), where the court seemed to give controlling significance to the fact that the position in question involved policymaking. See

also *Selch v. Letts*, 5 F.3d 1040, 1043 (7th Cir. 1993), where the *Branti* Court was said to have abandoned the "exclusive" use of the terms "policymaking" and "confidential" to describe the types of jobs for which political tests are not forbidden by the Constitution.

6. The plaintiffs in *Rutan* were a rehabilitation counselor and a road equipment operator who sought promotions, an applicant for a job as a prison guard, and a garage worker and a dietitian who had been laid off and wanted to be recalled. 497 U.S. at 67, 110 S.Ct. at 2733.

political under either analysis. This was so regardless of whether the plaintiff had in fact performed political or policy-oriented tasks as secretary to the former mayor. The "inherent" duties of a mayor's secretary—and the duties that the new mayor reasonably expected her secretary to perform—had a significant relationship to "the flow of information, whether by writing, speech, or personal visit, to and from the mayor's office. . . ." *Id.* at 913. And "[a]s political action cannot occur without communication, a position that controls the lines of communication of a political actor must be inherently political." *Id.* at 914.[7]

## III

■ Applying the lessons of *Faughender* and its antecedents here, it is clear, we believe, that Ohio's director of transportation is a "political actor." Responsible for overseeing the expenditure of enormous amounts of money taken from the citizens of the state by taxation, the director, like the governor who appointed him, obviously wants to see the money spent in ways that will maximize voter satisfaction and minimize voter dissatisfaction. And there is ample room for political disagreement on how the available resources should be allocated: should the road I take to work be upgraded, for example, at the cost of deferring similar work on some other road?

If the director and his central office staff are to do their jobs properly, they need lines of communication with the public and with political leaders who are in touch with the public. To a significant extent, the record of this case shows without contradiction, those lines of communication run through the 24 district deputy directors and administrative assistants located in department of transportation districts throughout the state.

It is true that most of the work of an administrative assistant is done at the district level and that much of his work is simply administrative in nature. But all politics is local, as the saying goes, and the paper-shuffling functions of the transportation department's top political people in the field did not make their jobs any more "unpolitical" than did the routine typing and filing performed by the secretary of the mayor in the *Faughender* case. District 8 covered a substantial geographical area, moreover, and each of the 12 districts in the Ohio transportation system would doubtless have been larger than the highway subdistrict involved in *Selch v. Letts,* 5 F.3d 1040 (7th Cir.1993). The superintendency of the *Selch* subdistrict was held to be exempt from First Amendment protection notwithstanding that the Indiana Department of Highways had a total of 36 subdistricts, each with its own politically appointed superintendent.

It is also true that the Ohio director of transportation did not himself work closely with each of the administrative assistants in the field. How could he be expected to, given the size of his operation? Administrative Assistant McKee Cornett, Mr. Rice's sometime boss in Lebanon, Ohio, may not have been a regular visitor to the inner sanctum of Director Weir at the state capitol, but it is safe to assume that Mr. Cornett could pick up the telephone and talk to Patrick McCray, the deputy director for administrative affairs, just as Mr. Rice himself did on

7. *Faughender* is consistent, we believe, with a number of appellate court decisions that have treated the *Elrod/Branti* exception as a fairly broad one. Of these cases, the one that is probably closest to the case at bar on its facts is *Selch v. Letts,* 5 F.3d 1040 (7th Cir.1993), where the job of an Indiana highway subdistrict superintendent was held to come within the exception. Also helpful is *Jimenez Fuentes v. Torres Gaztambide,* 807 F.2d 236 (1st Cir.1986) (en banc), *cert. denied,* 481 U.S. 1014, 107 S.Ct. 1888, 95 L.Ed.2d 496 (1987), where a regional directorship in an urban development and housing agency was held to come within the exception because the position "involve[d] government decisionmaking on issues where there [was] room for political disagreement on goals or their implementation" and because the responsibilities of the job were such that the person holding it "resembles a policymaker, a privy to confidential information, a communicator, or some other office holder whose function is such that party affiliation is an equally appropriate requirement." *Id.* at 241–42. Other cases are collected in Martin, *A Decade of Branti Decisions: A Government Official's Guide to Patronage Dismissals,* 39 Am.U.L.Rev. 11 (1989).

occasion.[8] Nothing in the controlling case law suggests that exceptions to the merit-based principles that were constitutionalized in *Elrod, Branti,* and *Rutan* must be limited to a small circle of people who report directly to the department head. Given the size of modern state governments, such a limitation would be unrealistic.

We do not mean to suggest that Ohio's director of transportation would be free to make patronage appointments "wholesale," to use the term repeatedly employed by Justice Brennan in *Elrod,* even if Ohio law permitted it. In a department of 9,000 persons, however, it is hardly unreasonable to suppose that a few dozen positions could properly be classified as politically sensitive.

■ No particular mix of political and non-political slots is inevitable, of course. Director Weir candidly acknowledged that his appointment of administrative assistants did not have to be political, and we daresay that it would have been possible for him to operate the department without any politically vetted appointees at all. But the test is not whether party affiliation and support are *essential* to the effective performance of the public office involved; the test, under *Branti,* is whether these are "appropriate" require-

ments. The outer limits of what is appropriate are now subject to determination by the courts,[9] but within those limits, surely, the judgment of the people's elected representatives merits respect. This is the lesson of *Faughender,* where we held that the mayor was entitled to decide for herself whether to give her secretary political responsibilities that would justify appointment on a political basis.

It may be instructive, in this connection, to consider the change that occurred 25 years ago in the operation of the United States Postal Service. Prior to 1969 it had long been the practice to apply partisan political tests in the appointment of postmasters. There were those who doubted that such a practice was essential to the effective operation of the postal system, and President Nixon, in the first message he sent to Congress after taking office, recommended legislation designed to take politics out of the appointment of postmasters. Congress ultimately accepted the President's recommendation, and a legislatively mandated Postal Service merit system has been in place ever since. Some may consider this merit system's merits debatable as a matter of policy. As a matter of law, however, if Chief Justice Taft

---

**8.** Although Director Weir could not recognize Administrative Assistant Siehl and Acting Administrative Assistant Fife by sight, the district court does not seem to have considered this significant. Neither do we. Even the President of the United States may not always be able to recognize members of his cabinet, but no one would argue that the position of a cabinet officer is not inherently political.

**9.** Justice Powell criticized the *Branti* standard as "certain to create vast uncertainty," *Branti,* 445 U.S. at 524, 100 S.Ct. at 1297 (Powell, J., dissenting), and Justice Scalia suggested that "[w]hat [it] means is anybody's guess." *Rutan,* 497 U.S. at 111, 110 S.Ct. at 2756 (Scalia, J., dissenting). At a minimum, however, we take it that courts are entitled to look at the factors mentioned by Justice Brennan in *Elrod:* the scope of the employee's responsibilities, the clarity with which those responsibilities are defined, and "whether the employee acts as an adviser or formulates plans for the implementation of broad goals." *Elrod,* 427 U.S. at 368, 96 S.Ct. at 2687. All of these factors militate in favor of the conclusion that the administrative assistant's job sought by Mr. Rice was a policymaking one. Administration, budgeting and auditing, planning, right-of-way, and construction—the five areas named in the job description—cover a very broad water-

front, and the responsibilities of the administrative assistant in these areas were by no means well defined. The latter circumstance makes it "more likely" that the administrative assistant "function[ed] in a policymaking position." *Elrod, Id.* So too does the fact that the administrative assistant was responsible for conferring with a broad range of staff members "on matters involving policy determination...." Whether the "policymaking" label fits here is not the ultimate inquiry, to be sure, but the answer to that question clearly has a bearing on the appropriateness of allowing political tests to be applied in filling the job. Other significant questions are whether the administrative assistant functioned as a "communicator" on subjects not purely technical in nature, see *Faughender,* 927 F.2d at 914, whether he had "meaningful input into government decisionmaking on issues where there is room for principled disagreement on the goals or their implementations," *Nekolny v. Painter,* 653 F.2d 1164, 1170 (7th Cir.1981), *cert. denied,* 455 U.S. 1021, 102 S.Ct. 1719, 72 L.Ed.2d 139 (1982), and, more precisely, whether he had meaningful input into decisions on "where and when, within his [district,] work was to be done." *Selch,* 5 F.3d at 1045.

was correct in *Myers*, the decision to extend the merit system to the appointment of postmasters was one properly left to the people's elected representatives. Even after *Elrod* and *Branti*, the legislature's decision as to whether a particular job should be classified as political or nonpolitical is at least entitled, as the First Circuit has said, to "some deference." *Jimenez Fuentes*, 807 F.2d at 246.

The functions that local administrative assistants performed in the Ohio Department of Transportation under Governor Rhodes bore more than a passing resemblance to the functions that local postmasters performed under President Lyndon Johnson and virtually all of the latter's predecessors. Both types of job had a political dimension, and it was not inappropriate—and thus not illegal—to apply political tests in selecting the relatively small number of people needed to perform such jobs.

For the reasons stated, the final judgment entered by the district court in favor of the defendants in this case is **AFFIRMED.**