Timothy E. **FEENEY**, Plaintiff–
Appellant,

v.

Charles **SHIPLEY**; State of Ohio; Ohio
Department of Public Safety,
Defendants–Appellees.

No. 97–3715.

United States Court of Appeals,
Sixth Circuit.

Argued Sept. 21, 1998.

Decided Jan. 8, 1999.

Kevin L. Shoemaker (argued and briefed), Christensen, Shoemaker & Winkler, Columbus, Ohio, for Plaintiff–Appellant.

Jack W. Decker (argued and briefed), Office of the Attorney General, Employment Law Section, Columbus, Ohio, for Defendants–Appellees.

Before: MERRITT, JONES, and SILER, Circuit Judges.

MERRITT, Circuit Judge.

Pursuant to 42 U.S.C. § 1983, plaintiff Timothy Feeney sued defendants the Ohio Department of Public Safety ("the Department"); Charles Shipley, its Director; and the State of Ohio. Feeney, a former employee of the Department, alleged that he had been unconstitutionally terminated from his position because of his political affiliation. The district court found that political affiliation was an appropriate requirement for the effective performance of his position and granted summary judgment in favor of the defendants. This case presents two issues for this Court. First, when an employee is discharged and then involuntarily reinstated for a brief period due to a procedural defect by an employer that has rightfully exercised its prerogative to abolish altogether the employee's former position, must a court, in determining whether political association was an appropriate consideration for that public office, base its analysis upon the employee's actual duties during his brief reinstatement, or rather upon the inherent duties long performed by the employee before and at the time the defendants formed their intent to abolish his position and terminate his employment? Second, based on our determination of that antecedent question, we must address whether the government's decision to fire Feeney unconstitutionally inhibited his rights to freedom of belief and association by conditioning his public employment on his political affiliation. For the following reasons, we affirm the judgment of the district court.

## I. BACKGROUND

Feeney initially went to work for the Department in 1988 as its Chief of Field Services. When he subsequently learned that the position of Traffic Safety Supervisor had become vacant, Feeney expressed his interest in that position to William Denihan, a political acquaintance who served as Director of the Department in the administration of then Ohio Governor Richard Celeste, a Democrat. Feeney was eventually hired for the post as an unclassified state civil servant. His official job description, approved by himself and Director Denihan, specifically stated that "[t]his is an unclassified position serving at the pleasure of the appointing authority." Later that year, the Department redesignated the position as classified.[1]

1. Ohio Rev. Stat. Ann. s. 124.11 (Baldwin 1993)    provides, in pertinent part:

In January 1991, Republican Governor George Voinovich succeeded Governor Celeste. Concurrently, defendant Charles Shipley became the new Director of the Department, a politically-appointed position. Director Shipley soon requested that the Ohio Department of Administrative Services determine whether various positions at the Department had been misdesignated as classified at the end of the Celeste Administration. As a result, Feeney was notified in February 1991 that his position had been erroneously included in the classified service and that it was in fact an unclassified position. In Ohio, a public employee hired as a classified civil servant does not have a property right in continued status as a classified employee; consequently, where a classified position is made unclassified, a former classified civil service employee need not be afforded procedural due process prior to termination. *See Shearer v. Cuyahoga County Hosp.*, 34 Ohio App.3d 59, 516 N.E.2d 1287 (1986). Thus, in the instant matter, when Feeney was eventually terminated on June 1, 1993, he was not entitled to a hearing before his discharge. *See State ex rel. Trimble v. State Bd. of Cosmetology*, 50 Ohio St.2d 283, 364 N.E.2d 247 (1977). Feeney was not replaced by a new hire.

Feeney appealed his removal to the State Personnel Board of Review, challenging the unclassified status of his position. The Board's Administrative Law Judge reversed Feeney's termination based upon a finding that Feeney's position was in fact in the classified civil service because he had never been authorized to cast a vote in any official capacity on behalf of Director Shipley and did not have enough personal contact with the Director to be regarded a fiduciary. In light of the evidence that the Department had not followed the procedures applicable to terminating the position of a classified employee, the Board ordered the Department to reinstate Feeney and to pay him back wages and benefits. After the Board had reversed his removal as an unclassified employee, Ohio law, as interpreted in *State ex rel. Olander v. EPA*, 45 Ohio St.3d 196, 543 N.E.2d 1262 (1989), required that Feeney be reinstated to his former position. Feeney returned to work, but he soon discovered that he had few of the responsibilities that he had been assigned under the Celeste Administration. The Director found another way to terminate Feeney. In July 1994, he provided to Feeney, in person, written notification that his position would be abolished according to the rules applicable to classified employees. He was then terminated effective July 29, 1994.

Feeney again appealed to the State Personnel Board of Review but to no avail. In affirming the abolishment of Feeney's position and his second termination from the position of Traffic Safety Supervisor, the Board made several important determinations. First, the Board noted that as early as 1991, Director Shipley had considered a significant reorganization of the Department as a way of eliminating both the redundant offering of services and supervisory positions whose duties could better be performed by others. As early as 1992, well before Feeney's unclassified removal in 1993, that reorganization was well under way, as was a consolidation of the Office of Field Services with and a subordination thereof to the Office of the Governor's Highway Safety Representative. There was also substantial testimony

The civil service of the state and the several counties, cities, civil service townships, city health districts, general health districts, and city school districts thereof shall be divided into the unclassified and the classified service. (A) The unclassified service shall comprise the following positions, which shall not be included in the classified service, and which shall be exempt from all examinations required by this chapter:

....

(9) The deputies and assistants of elective or principal executive officers authorized to act for and in the place of their principals, or holding a fiduciary relation to such principals and those persons employed by and directly responsible to elected county officials and holding a fiduciary or administrative relationship to such elected county officials, and the employees of such county officials whose fitness would be impracticable to determine by competitive examination....

....

(B) The classified service shall comprise all persons in the employ of the state and the several counties, cities, city, health districts, general health districts, and city school districts thereof, not specifically included in the unclassified service.

that, at the time of the Board's initial final Order mandating that Feeney be reinstated to his Traffic Safety Supervisor position, that reorganization had been completed. Thus, when Feeney was reinstated and subsequently terminated again, nearly all of the six Traffic Safety Specialists whom he previously had supervised had been terminated or had assumed other significant duties due to either reorganization, retirement, or promotion. In effect, both the personnel and duties of the Field Services Section had been either dispersed, subsumed by the Office of the Governor's Highway Safety Representative or the Ohio State Highway Patrol, or ceased to be performed. Second, the Board noted that after Feeney was mistakenly removed as an unclassified civil servant, the Department never refilled the position (until Feeney's ordered reinstatement) and had no intention of ever refilling it, prior to the issuance of the Board's reinstatement mandate. Thus, although the Department mistakenly removed Feeney as an unclassified employee, it did so in order to eliminate an incumbent because its efficiency-driven reorganization strategy indicated that the position was at best redundant and that there was a lack of sufficient supervisory duties to be performed. Moreover, the Department demonstrated that, for the one year period subsequent to Feeney's unclassified removal and prior to his reinstatement, it was able to evaluate and demonstrate that Feeney's position was no longer needed. Finally, the Board found no evidence in the record to indicate that the Department had abolished Feeney's position out of animus or ill will toward him or for any reason directed at him personally.

Feeney then appealed his case to the Franklin County (Ohio) Court of Common Pleas, which affirmed the determination of the State Personnel Board of Review. This decision was subsequently affirmed by the Franklin County Court of Appeals, and Feeney's discretionary appeal to the Ohio Supreme court failed. Feeney then filed an action pursuant to 42 U.S.C. § 1983 in the Franklin County Court of Common Pleas, which action defendants Charles Shipley, the Department and the State of Ohio removed to the U.S. District Court for the Southern District of Ohio. A federal magistrate judge then bifurcated the case to allow the defendants to file a potentially dispositive motion to establish that political affiliation was an appropriate basis for abolishing Feeney's position. In granting the defendants' Motion for Summary Judgment and dismissing all claims against them, District Judge Graham held that the inherent duties of Feeney's position of Traffic Safety Supervisor were such that political affiliation was an appropriate consideration in the government's decision.

## II. THE *Elrod–Branti* EXCEPTION

### A. Political Patronage

■ Whether political affiliation is an appropriate requirement for a particular government position is a question of law. See *Mumford v. Basinski*, 105 F.3d 264, 271 (6th Cir.1997). Thus, the issue on summary judgment is "whether Defendants have established that no genuine factual issue exists as to whether political affiliation may appropriately be considered" with respect to the position in question. *Hunter v. Wray*, 908 F.Supp. 485, 489 (S.D.Ohio 1995).

Political patronage is a well-established feature of American politics. When Andrew Jackson of Tennessee was inaugurated as President of the United States in 1829, he made clear to his cabinet members not only that he planned, as part of his popular reforms, to exercise his appointive powers to restore "moral virtue" to government, but also that he expected their full cooperation and loyalty. The specter of a cleansing of the capital's Augean political stables sparked heated debate in Washington. Many attacked Jackson, arguing that his removal of dedicated, elite public servants in favor of political loyalists had brought the nation under a reign of terror not unlike that experienced during the French Revolution. See ROBERT V. REMINI, ANDREW JACKSON AND THE COURSE OF AMERICAN FREEDOM 1822–1832 185 (1981) (citing contemporary newspaper articles). By contrast, Democrats enjoyed the fruits of the spoils system and their association with the nation's new populist, frontiersman President. *See id.* As Senator William

Learned Marcy of New York told his colleagues on the Senate floor: "To the victor belongs the spoils of the enemy." Although the spoils system is popularly associated with Old Hickory, its American roots had already taken hold at the federal level at least as early as the Presidency of Thomas Jefferson. *See* MARTIN TOLCHIN & SUSAN TOLCHIN, TO THE VICTOR 323 (1971). Nearly two hundred years later, political patronage remains an element of American government.

## B. The Elrod–Branti *Exception*

The Supreme Court stated in *Elrod v. Burns,* 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976), that "[t]he cost of the practice of patronage is the restraint it places on freedoms of belief and association." *Id.* at 355, 96 S.Ct. 2673. These two freedoms constitute the core of those activities protected by the First Amendment. "Patronage, therefore, to the extent it compels or restrains belief and association, is inimical to the process which undergirds our system of government and is at war with the deeper traditions of democracy embodied in the First Amendment." *Id.* at 357, 96 S.Ct. 2673 (quotations and citations omitted).

The Supreme Court has had numerous opportunities to consider the validity of specific government actions that inhibit belief and association through the conditioning of public employment on political faith. *See, e.g., Cafeteria and Restaurant Workers Union v. McElroy,* 367 U.S. 886, 898, 81 S.Ct. 1743, 6 L.Ed.2d 1230 (1961) (recognizing that government cannot deny employment because of previous membership in political party); *Wieman v. Updegraff,* 344 U.S. 183, 73 S.Ct. 215, 97 L.Ed. 216 (1952) (holding that State cannot require employees to establish their loyalty by extracting oath denying past affiliation with Communist Party); *United Public Workers v. Mitchell,* 330 U.S. 75, 100, 67 S.Ct. 556, 91 L.Ed. 754 (1947) ("Congress may not enact a regulation providing that no Republican, Jew or Negro shall be appointed to federal office."). The Court's opinions in *Elrod* and *Branti v. Finkel,* 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980), drastically altered the political patronage system. Together, they generally made political affiliation an improper basis for adverse employment actions, and then carved out exceptions by recognizing that there are positions for which political affiliation is a proper basis for termination.

■ In *Elrod v. Burns,* noncivil service employees of the Cook County, Illinois, sheriff's office, all Republicans, brought a class action alleging that they were fired or threatened with dismissal for the sole reason that they were not affiliated with or sponsored by the political party of the sitting sheriff, a Democrat. The Court, in a plurality opinion by Justice Brennan, stated that the sheriff's longstanding practice of political patronage deprived the employees of the constitutional rights secured by the First and Fourteenth Amendments. The Court noted that "[t]he threat of dismissal for failure to provide [political patronage] unquestionably inhibits protected belief and association, and dismissal for failure to provide support only penalizes its exercise." 427 U.S. at 359, 96 S.Ct. 2673. Nevertheless, the Court also made clear that "the prohibition of First Amendment protections is not an absolute." *Id.* at 360, 96 S.Ct. 2673. Rather, under *Buckley v. Valeo,* 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976), a significant impairment of First Amendment rights may pass constitutional muster if it survives exacting scrutiny. *See Elrod,* 427 U.S. at 362, 96 S.Ct. 2673. Thus, a court may uphold a personnel decision based solely upon considerations of political patronage only if it "further[s] some vital government end by a means that is least restrictive of freedom of belief and association in achieving that end, and the benefit gained must outweigh the loss of constitutionally protected rights." *Id.* at 363, 96 S.Ct. 2673. Otherwise, no government authority may require that a person's personal beliefs be the sole basis either for hiring him or depriving him of continued public employment.

The *Elrod* Court noted that the need for employees' political loyalty can be especially important "to the end that representative government not be undercut by tactics obstructing the implementation of policies of the new administration, policies presumably sanctioned by the electorate." *Id.* at 367, 96 S.Ct. 2673. However, because that rationale

is "inadequate to validate patronage wholesale," *id.,* the Court established the following limiting principle: " limiting patronage dismissals to policymaking positions is sufficient to achieve this governmental end," *id.,* as "[n]onpolicymaking individuals usually have only limited responsibility and are therefore not in a position to thwart the goals of the in-party," *id.* Although it acknowledged the difficulty inherent in drawing lines between policymaking and nonpolicymaking decisions, *see id.,* the Court stated that in determining whether an employee occupies a policymaking position, consideration should be given both to the nature of his responsibilities and to whether the employee acts as an adviser or formulates plans for the implementations of broad goals, *see id.* at 368, 96 S.Ct. 2673.

In *Branti v. Finkel,* 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980), the Supreme Court affirmed and clarified its holding in *Elrod.* In that case, two county assistant public defenders, both Republicans, brought suit in federal district court to enjoin Branti, a Democrat and the recently appointed Public Defender of Rockland County, New York, from discharging them based solely on their political affiliation. Justice Stevens, writing for the Court, reaffirmed the holdings of the *Elrod* plurality that patronage dismissals violate the First Amendment except where permitting politically-motivated dismissals of persons in certain politically sensitive positions is necessary to uphold a vital government interest. *See id.* at 513–16, 17, 96 S.Ct. 2673 ("[I]f an employee's private political beliefs would interfere with the discharge of his public duties, his First Amendment rights may be required to yield to the State's vital interest in maintaining governmental effectiveness and efficiency."). However, the *Branti* Court also significantly reformulated the scope of permissible political patronage. Specifically, the Court departed from the policymaking and confidential labels espoused in *Elrod,* recognizing that the labels were underinclusive because "a position may be appropriately considered political even though it is neither confidential nor policymaking in character." *Id.* at 518, 100 S.Ct. 1287. More importantly, the Court found that the labels were also overinclusive, because party affiliation is not a relevant con-

sideration for all policymaking or confidential positions. *See id.* The Court distinguished between policymaking positions related to "partisan political interests," *id.* at 519, 100 S.Ct. 1287, which would be vulnerable to discharge, and positions having no bearing on such concerns, which would be protected by the First Amendment, *see id.* The Court concluded:

> In sum, the ultimate inquiry is not whether the label "policymaker" or "confidential" fits a particular position; rather, the question is whether the hiring authority can demonstrate that party affiliation is an *appropriate requirement* for the effective performance of the public office involved.

*Id.* (emphasis added).

Applying its own test, the *Branti* Court held that the continued employment of an assistant public defender cannot properly be conditioned upon his allegiance to the political party in control of the county government. *See id.* The Court noted that the primary, if not the only responsibility of an assistant public defender is to represent his clients—individual citizens—in controversies with the State. Thus, "whatever policymaking occurs in the public defender's office must relate to the needs of individual clients and not to any partisan political interests." *Id.* The petitioners' rights to freedom of belief and association were therefore protected by the First Amendment against such government infringement.

## C.  Interpreting the Elrod–Branti *Exception*

In a series of four important recent cases, this Court has interpreted and elaborated upon the *Elrod–Branti* exception enunciated by the Supreme Court. *See McCloud v. Testa,* 97 F.3d 1536 (6th Cir.1996); *Rice v. Ohio Dep't of Transp.,* 14 F.3d 1133 (6th Cir.1994); *Faughender v. City of North Olmsted,* 927 F.2d 909 (6th Cir.1991); *Williams v. City of River Rouge,* 909 F.2d 151 (6th Cir.1990).

In *Williams v. City of River Rouge,* 909 F.2d 151 (6th Cir.1990), we held that the office of City Attorney did not enjoy First Amendment protection against politically motivated dismissal, as it was a position for

which political affiliation was an appropriate requirement for effective performance. Careful to distinguish the position of City Attorney from the office of public defender considered in *Branti*, our Court noted that the record illustrated that the City Attorney could be involved in defending the City against suits arising out of disputes over City policy, such as bond issue proposals; in negotiating on the City's behalf in contract disputes; and as the City's solicitor. Our Court found that the City of River Rouge had demonstrated that City Attorney was by nature a position for which political affiliation is relevant to effective performance. *See id.* at 154. Thus, the mayor was entitled to the complete cooperation and loyalty of a trusted advisor in that post. *See also Ness v. Marshall*, 660 F.2d 517, 522 (3d Cir.1981) (holding that dismissal of city solicitor and assistant city solicitor based on party affiliation did not violate first amendment rights).

In reaching our holding in *Williams*, we acknowledged that any given particular City Attorney might not in fact be so involved in the City's affairs depending on the circumstances of his or her individual responsibilities. However, the court made clear that "[w]hen examining a public office for first amendment protection against politically-motivated dismissal, the relevant focus of analysis is the *inherent duties* of the position in question, not the work actually performed by the person who happens to occupy the office." *Id.* (emphasis added) (citing *Meeks v. Grimes*, 779 F.2d 417, 419 n. 1 (7th Cir.1985); *Ness*, 660 F.2d at 522). Given the various responsibilities potentially assumed by a City Attorney, we noted that "it is necessary to consider the position of City Attorney itself, rather than the position as performed by appellant. Any other approach would tend to bind a later mayor to employ the City Attorney in the way that the official had been employed in the past." *Id.* at 155.

In *Faughender v. City of North Olmsted*, 927 F.2d 909 (6th Cir.1991), the secretary of the former mayor of North Olmsted brought suit against the City, alleging that her position involved no politically or policy-related duties and that the new mayor's failure to rehire her violated her First Amendment

rights. A unanimous panel of this Court disagreed. Relying on the admonition in *Williams* that we should examine the "position ... itself, rather than the position as performed by [the plaintiff]," *Williams*, 909 F.2d at 155, to determine whether political considerations are appropriate in making personnel decisions, the panel held that it "must examine the *inherent duties* of that position and the duties that the new holder of that position will perform." *Faughender*, 927 F.2d at 913 (emphasis added). In light of the fact that a secretary has access to confidential and political material and must undertake those functions in relation to the flow of information that the mayor wants her to perform, whether by writing, speech, or personal visit, to and from the mayor's office, this Court found that these duties are "inherently political," *id.* at 913, and that "political loyalty, whether partisan or personal, is an essential attribute of the job," *id.* at 914. *See also Balogh v. Charron*, 855 F.2d 356 (6th Cir.1988) (noting that test of confidential employment is an "objective standard. It depends on the function of the job.").

In *Rice v. Ohio Department of Transportation*, 14 F.3d 1133 (6th Cir.1994), a case relied upon heavily by the defendants in the instant matter, we held that the Ohio Department of Transportation had not violated the First and Fourteenth Amendment rights of Mr. Rice, who was passed over for appointment to an administrative assistant's position within that department. According to this Court, the Director of Ohio's Department of Transportation is a "political actor." *Id.* at 1141. As we described the role of the Director, who would have been Rice's superior had he received his sought appointment:

> Responsible for overseeing the expenditure of enormous amounts of money taken from the citizens of the state by taxation, the director, like the governor who appointed him, obviously wants to see the money spent in ways that will maximize voter satisfaction and minimize voter dissatisfaction. And there is ample room for political disagreement on how the available resources should be allocated.

*Id.*

Citing *Branti* for the proposition that the "ultimate inquiry ... is whether the hiring

authority can demonstrate that party affiliation is an appropriate requirement for the effective performance of the public office involved," 445 U.S. at 518, 100 S.Ct. 1287, we then reviewed the duties of the particular position in question. The court found that administrative assistants had a role in making policy recommendations in their respective bailiwicks; they were expected to confer with the top staff in the district and recommend changes in policies promulgated by the central office in Columbus where changes seemed to be called for. *See Rice,* 14 F.3d at 1137. "The task of working out appropriate priorities had a political dimension, obviously, and the record shows without contradiction that the administrative assistants provided political input in this sensitive area." *Id.* at 1138. Moreover, administrative assistants worked with the county chairmen, local public officials, state legislators and the general public in their respective districts to determine what problems and needs existed at the local level. They were, in effect, ombudsmen serving the Director, a "political actor." In light of these open lines of communication between the Director and his administrative assistants, the court found unpersuasive the argument that the administrative nature of much of the assistants' work rendered their positions unpolitical in nature. On the contrary: "[A]ll politics is local, as the saying goes, and the paper-shuffling functions of the transportation department's top political people in the field did not make their jobs any more 'unpolitical' than did the routine typing and filing performed by the secretary of the mayor in the *Faughender* case." *See id.* at 1142. In addition, the court held that it would be "unrealistic" to limit to a small circle of people who report directly to the department head the exceptions to the merit-based principles that were constitutionalized in *Elrod* and *Branti. See id.*

Most recently, in *McCloud v. Testa,* 97 F.3d 1536 (6th Cir.1996), we held that First Amendment protection for public employees from adverse employment actions based on political patronage extends even to nonideological factions of a single political party. In that case, this Court set forth four categories of job positions that fall into the *Elrod–Branti* exception:

**Category One:** positions specifically named in relevant federal, state, county or municipal law to which discretionary authority with respect to the enforcement of that law or the carrying out of some other policy of political concern is granted;

**Category Two:** positions to which a significant portion of the total discretionary authority available to category one positions-holders has been delegated; or positions not named in law, possessing by virtue of the jurisdiction's pattern or practice the same quantum or type of discretionary authority commonly held by category one positions in other jurisdictions;

**Category Three:** confidential advisors who spend a significant portion of their time on the job advising category one or category two position-holders on how to exercise their statutory or delegated policymaking authority, or other confidential employees who control the lines of communication to category one positions, category two positions or confidential advisors.

**Category Four:** positions that are part of a group of positions filled by balancing our political party representation, or that are filled by balancing out selections made by different governmental agents or bodies.

*Id.* at 1557. While no doubt helpful in analyzing whether a particular government position comes within the *Elrod–Branti* exception, *McCloud* does not require that a government position fall neatly within one of these generic categories.

### III. DISCUSSION

#### A. *The Basis Of This Court's "Inherent Duties" Analysis*

■ Before turning to the issue of whether political association was an appropriate consideration for the position of Traffic Safety Supervisor, we must address the antecedent question of whether this Court's analysis should be based upon the nature of his initial position when the defendants formed their intent to abolish his post, or rather upon Feeney's truncated responsibilities during his brief eight-week period of reinstatement prior to his final termination. After Governor Voinovich and Director Shipley

took office, Feeney was terminated and later reinstated pursuant to the mandate of the State Personnel Board of Review. Upon returning to his position after Director Shipley had determined that the position of Traffic Safety Supervisor was to be altogether abolished, Feeney found that he had very little to do. Feeney was again terminated by the Department, this time according to the proper formal procedure for terminating a classified member of the state civil service. Feeney contends that the position to which he returned entailed so few duties and responsibilities that it could not properly have been characterized as a position for which political affiliation was an appropriate consideration, and hence it was not exempt from the prohibition against patronage-based personnel decisions. As plaintiff/appellant argues on appeal, although the issue of whether his position was a political one

> may have been arguable when Feeney was first employed at the Ohio Department of Public Safety, upon his return he had no duties which placed him in a position to control any lines of communication between a deputy director or director and the public. He certainly had no authority to make decisions and the only individual that he actually supervised did not require a supervisor after Feeney was laid off. In fact, the State Defendants successfully argued to the State Court that all of the duties that Feeney had previously performed were being performed by others.

Plaintiff/Appellant's Br. 12. In addressing this question, the Seventh Circuit's opinion in *Bicanic v. McDermott,* 867 F.2d 391 (7th Cir.1989), and this Court's opinion in *Faughender v. City of North Olmsted,* 927 F.2d 909 (6th Cir.1991), guide our analysis.

In *Bicanic,* the Seventh Circuit considered the section 1983 claims of a former city coordinator of park and recreation programs who challenged his discharge as politically motivated. Like Feeney, Bicanic was terminated when an election brought a new party to office by way of a mayoral election. The district court concluded that Bicanic held a politically sensitive position and therefore could be fired for political reasons. Accordingly, it granted the defendant's Motion for

Summary Judgment. In affirming the lower court, the court rejected precisely the reasoning upon which Feeney would have the Sixth Circuit rely in the instant matter:

> If the City of Hammond reorganized its parks department so that all of Bicanic's duties were distributed elsewhere, then the City had no need of his services no matter what his politics. *A political appointee does not acquire tenure as a civil servant when the tasks of the job are abolished or redistributed—for the abolition of a political job is itself a political deed, no more actionable than firing the holder of a job whose duties are unchanged....* It cannot be that if a mayor so distrusts an appointee that he first strips away the person's duties and then, when the appointee does not get the message, pulls the rug out from under him, the Constitution treats the initial step (deprivation of responsibility) as interdicting the second (discharge).

867 F.2d at 394 (emphasis added).

■ In *Faughender,* our Court set forth a two-prong test for determining whether political considerations are appropriate in specific personnel decisions. Under *Faughender,* we must examine the "inherent duties of that position and the duties that the new holder of that position will perform," rather than the position as performed by the actual plaintiff. 927 F.2d at 913. In the instant matter, however, Feeney was never succeeded; rather, his position was abolished altogether and the responsibilities of Traffic Safety Supervisor were reassigned to other divisions. Hence, the second prong of *Faughender'*s two-pronged test is inapposite and only the first prong—"the inherent duties" of the position in question, *id.*—applies. On appeal, Feeney does not even discuss what his position entailed prior to his June 1, 1993, discharge. Rather, Feeney contends that the inherent duties of the position of Traffic Safety Supervisor for the Department are to be determined solely with reference to his actual job duties during his eight-week reinstatement. Feeney's argument would require this Court to ignore altogether the significant responsibilities which his position entailed under the Celeste Administration

and instead to base an analysis of the inherent duties of his position upon the meager responsibilities that remained after a new administration had exercised its prerogative to restructure the Department. Accordingly, we hold that in determining whether a hiring authority can determine that party affiliation is an "appropriate requirement for the effective performance of the public office involved," *Branti*, 445 U.S. at 519, 100 S.Ct. 1287, a court's analysis should focus on the nature of the office when the defendants first formed the intent to abolish the plaintiff's position.

### B. The Political Nature of Feeney's Inherent Duties

■ We now turn to the ultimate inquiry in this case: whether the Department can demonstrate that party affiliation was an "appropriate requirement for the effective performance," *id.*, of the position of Traffic Safety Supervisor at the time when the Voinovich Administration decided to abolish it. It is clear that this question should be answered in the affirmative and that summary judgment is therefore appropriate. Several factors support this conclusion.

■ Under *Faughender* we look to the "inherent duties" of a position and not merely at the job as performed by the plaintiff. However, in some cases, as here, a plaintiff's actual duties may nonetheless serve as evidence of the duties inherent in the position. *See Smith v. Sushka*, 117 F.3d 965, 970 (6th Cir.1997). Nothing in the inherent nature of the Traffic Safety Supervisor position contradicts the actual duties previously performed by Feeney at the time the defendants formed their intent to restructure the Department and abolish his position. In fact, the position as described by the Celeste Administration further supports the finding that actual duties accurately reflected the inherent duties of the position:

65% Acting on behalf of the Department, position will develop, monitor and co-ordinate statewide highway safety programs. Position will serve as liaison between other departments, public officials, special service groups and the general public on matters concerning statewide Highway Safety programs. Assigns work schedule to subordinate positions. Has authority to hire, transfer and discipline subordinate positions. Direct supervision of subordinates in the statewide coordination of Department's Field Services Office.

15% Position will represent the Department at meetings and conferences concerning Highway Safety programs in and out of state. Attendance at conferences and meetings will require contact through correspondence and verbal communication with other departments, public officials, special interest groups and the general public.

15% On behalf of the Department, position will participate in public meetings, conferences and educational seminars statewide concerning Highway Safety. Position will be required to give public speeches and lectures on Highway Safety related information. Travel is required both in and out of state.

5% Other related duties as assigned by superior.

Moreover, Feeney concedes that he had the authority to make policy within his area of expertise and to recommend policy changes within the Department.

The district court reviewed the *McCloud* rubric of positions which fall under the *Elrod–Branti* exception and for which party affiliation may be an appropriate requirement. *See McCloud*, 97 F.3d at 1557. The court correctly found (1) that the Director of the Department and Deputy Director fall under Category One and Category Two, respectively, and (2) that based on its inherent duties, Feeney's position fell under Category Three, that is, a "confidential advisor" to Category One and Two officials. Feeney was the only Traffic Safety Supervisor at the Department. His immediate supervisor was Deputy Director Bob Simpson. After Republican George Voinovich became Governor in 1991, Simpson was replaced by Jonathan Hughes. When Shipley began to restructure the Department, supervision of Feeney was passed from Hughes to Deputy Director

Laura Ludwig in 1992. Feeney reported to and advised, in turn, Simpson, Hughes, and Ludwig, who all reported to the Director of the Department. Feeney's position as a confidential advisor under the titular designation of Traffic Safety Supervisor thus falls under *McCloud* as a position for which "party affiliation is an appropriate requirement for the effective performance of the public office involved." *Branti*, 445 U.S. at 519, 100 S.Ct. 1287.

In *Rice v. Ohio Department of Transportation*, 14 F.3d 1133 (6th Cir.1994), our Court held that the Ohio Department of Transportation had not violated the First Amendment rights of plaintiff Rice, who was passed over for an appointment to an administrative assistant's position within that department. Several elements of our analysis in *Rice* are relevant to the instant matter. First, we found that the Director of the State Department of Transportation had extensive discretion over how the public fisc would be used to achieve the aims of his department. In holding that the Director of the Department of Transportation is a "political actor," this Court noted that there is "ample room for political disagreement on how the available resources should be allocated." *Id.* at 1141. In the instant matter, as the lower court noted in its order granting the defendant's Motion for Summary Judgment, Director Shipley is responsible for overseeing the expenditure of substantial tax revenues and federal grants that fund various highway safety programs. Just as in *Rice*, such resource allocation involves highly sensitive political choices and is one of the most important policymaking decisions in government. We thus find that the Director of the Department, like his counterpart in the Ohio Department of Transportation, is very clearly a position for which political affiliation may properly be considered in personnel decisions. Second, the *Rice* Court held that the *Elrod–Branti* exceptions are not limited strictly to the Director of a department, but rather also extend to those functionaries whose responsibilities include serving as a line of communication between the Director and the general public. *See id.* at 1141 ("[A] position that controls the lines of communication of a political actor must be

inherently political."). Feeney's tenure in the Celeste Administration required that he spend large portions of his time serving as liaison between other departments, public officials, special service groups and the general public on matters concerning statewide Highway Safety programs, including regular communication with and coordination of the Governor's Traffic Safety Committees; communicating with local field representatives to receive updates on their activities, which included updates on interactions with local elected municipal officials, judges, and police personnel; representing the Department at meetings and conferences concerning Highway Safety Programs in and out of state; and participating in public meetings, conferences and educational seminars statewide concerning highway safety. In this respect, Feeney certainly was an indispensable line of communication in the Celeste Administration between the Director of the Department and numerous other officials and members of the public, thereby entitling his position to an *Elrod–Branti* exception. As the district court correctly noted, it could "discern no meaningful distinction between Feeney's position within the Department and the position at issue in *Rice*."

In addition to those employees whose proximity to power and communication makes relevant their political affiliation, courts have also deemed "political"—and therefore subject to patronage decisions—positions that involve providing basic services to the public. The decisions of two other courts of appeals are instructive in this regard. *See McGurrin Ehrhard v. Connolly*, 867 F.2d 92 (1st Cir.1989); *Tomczak v. City of Chicago*, 765 F.2d 633 (7th Cir.1985). In *Tomczak*, the Seventh Circuit held that the city employee holding the second highest position in the city's water department was exempt from the general prohibition against patronage dismissals. In reversing the decision of the district court, the court of appeals rejected the lower court's assertion that because the goal of the Water Department was to provide service to all residents without regard to politics, there could be no principled disagreement about the basic policies of

the Department. *See id.* at 641. The court stated:

> This is an unduly myopic view of the role of politics in the seemingly apolitical context of universal provision of services.... The primary function of any local governmental entity is the provision of services such as police and fire protection, public schools, hospitals, transportation, and libraries, as well as quasi-utility functions such as water, garbage, and sewage services. Elections often turn on the success or failure of the incumbent to provide these services, and, as campaigns develop, the opposing sides put forth varying proposals about how best to provide services. While the ultimate goal of all sides might be the same, there is clearly room for principled disagreement in the development and implementation of plans to achieve that goal.

*Id.* Indeed, though policy formation at these levels necessarily concerns more mundane subjects such as potholes, refuse, snow removal, recreational activities and the like, these and other similar issues can make or break a political campaign and propel one's opponent into office.

Similar reasoning led to the result in *McGurrin Ehrhard.* In that case, the First Circuit considered whether the manager of the Secretary of State's Western Massachusetts regional office was a political position. Ehrhard, the manager, was several rungs removed from the Secretary of State and supervised only several low-ranking employees and interns. Moreover, the office's main functions were wholly ministerial. However, the office provided information to citizens in the Western part of the state about corporations, elections, and state rules and regulations; it sold state publications; and it ran a referral service directing citizens' problems and inquiries to the proper state agency. The court thus concluded that the job was a political one:

> [T]he office deals directly with the public, providing its services on an individual basis. Further, the office provides information, not simply about corporate registrations or state regulations, but about any question that any of the citizens of the state might have about the workings of state government.... [I]t seems less like providing a purely technical government service, such as water or electricity, than like providing direct, person-to-person assistance, *the type of "case work" for political constituents that is the very bread and butter of local political life.* Finally, the office sought to make members of the public aware that a particular elected official ... had provided the services they had obtained.

*Id.* at 95–96 (emphasis added).

Little, if anything, distinguishes the Department in the instant matter from either the Water Department in *Tomczak* or the Secretary of State's Western Massachusetts regional office in *McGurrin Ehrhard.* As the district court noted, the Department is a statutorily-defined department of the executive branch of the state of Ohio. *See* Ohio Rev.Code Ann. § 121.02K; *id.* ch. 5502. Divisions within the Department include the State Highway Patrol, the Bureau of Motor Vehicles and the Division of Emergency Medical Services. The Department's mission is to prevent motor vehicle accidents and reduce the number of fatalities and injuries resulting therefrom and to administer and enforce the laws of the state of Ohio relating to the registration and operation of motor vehicles and the licensing of drivers. These functions, like those provided by the agencies in *Tomczak* and *McGurrin Ehrhard,* are vital to the State of Ohio and inherently political in nature.

For the foregoing reasons, we hold that Feeney's position as Traffic Safety Supervisor was one for which political affiliation was an appropriate requirement for the effective performance of that public office, and that the government's decision to condition his continued employment on his political affiliation therefore did not inhibit Feeney's right to freedom of belief and association.[2] Ac

---

**2.** In the proceedings below, the district court also held that it would grant the Defendant's Motion for Summary Judgment on the basis that

Director Shipley was entitled to qualified immunity. In light of our determination that Feeney's position was one for which political affiliation

cordingly, we affirm the judgment of the district court.

was an appropriate consideration, we need not reach that issue.